I

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,              )
                                       )
              Plaintiff                )
                                       )
        -VS-                           )  Criminal No. 89-30028-REK
                                       )  Pages 1 - 67
JOHN L. ECKER,                         )
                                       )
              Defendant                )


**STATUS CONFERENCE**

BEFORE THE HONORABLE ROBERT E. KEETON
SENIOR UNITED STATES DISTRICT JUDGE


A P P E A R A N C E S :

    MARY ELIZABETH CARMODY, ESQ., Assistant United States
Attorney, Office of the United States Attorney, 1 Courthouse
Way, Boston, Massachusetts, 02210, for the Plaintiff.

    ROBERTO M. BRACERAS, ESQ. and NEIL T. SMITH, ESQ.,
Goodwin Procter, LLP, Exchange Place, 53 State Street,
Boston, Massachusetts, 02109, for the Defendant.


                        United States District Court
                        1 Courthouse Way, Courtroom 3
                        Boston, Massachusetts
                        July 14, 2005, 11:35 a.m.


                LEE A. MARZILLI
        CERTIFIED REALTIME REPORTER
        United States District Court
        1 Courthouse Way, Room 3205
              Boston, MA  02210
              (617)345-6787


S E A L E D    T R A N S C R I P T

1                          I N D E X

2     <u>WITNESS</u>                    <u>DIRECT</u>   <u>CROSS</u>    <u>REDIRECT</u>    <u>RECROSS</u>

3     ROBERT G. LUCKING, M.D.    14       50


4
      <u>EXHIBITS</u>                   <u>PAGE</u>
5
      <u>Government's</u>:
6
      1-7                        14
7
      8                          15
8
      9                          27
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25


S E A L E D   T R A N S C R I P T

1    Dr. Lucking?

2    A.    That is correct.

3    Q.    Okay.  Using the report to refresh your recollection,

4    could you answer the question, please, which I believe was,

5    could you describe for the Court, please, the delusional

6    system that you observed in Mr. Ecker when you were caring

7    for him late in the year in 2002?

8    A.    It was a code name "Alpha 1" in which he believed that

9    several women had been killed in Springfield and had been

10   killed throughout the country.

11   Q.    Springfield being the federal medical facility at

12   Springfield, Missouri?

13   A.    Springfield, Missouri.

14   Q.    Okay.  And was Mr. Ecker at one time housed in

15   Springfield, Missouri?

16   A.    Yes, he was.

17   Q.    And what did Mr. Ecker tell you with respect to his

18   delusion concerning the women in Springfield, Missouri?

19   A.    He believed that they had been killed.

20   Q.    And did he describe to you how they had been killed?

21   A.    He did not.

22   Q.    Did he describe to you why they had been killed?

23   A.    He did not.

24   Q.    What did he tell you?

25   A.    He told me that they had been killed, and there was a

SEALED   TRANSCRIPT

1    cover-up of all these murders that went into the higher

2    echelons of government, and that he -- one of the individuals

3    by the name of Terry Breshear was a spy for the CIA who had

4    recruited him and had shown up at the Federal Medical Center

5    in Springfield.  Because of his knowledge of this and other

6    activities that were occurring within the institutions, he

7    was now being held in Springfield illegally to keep his

8    silence.

9    Q.   Now, what other observations did you make of Mr. Ecker

10   when he came into your care in 2002?

11   A.   He was observed talking to himself as if carrying on a

12   conversation with another individual.  Some of the material

13   that he was talking about was related to this delusional

14   system of his Alpha 1 file.  He was constantly writing

15   letters and at one point wrote a letter to George Bush and to

16   William Gates requesting their assistance in his illegal

17   incarceration.

18        MS. CARMODY:  Your Honor, may I approach the

19   witness to give him a copy of the exhibits?

20   Q.   And I'm going to show you, Doctor, Exhibit No. 8.  The

21   rest of the exhibits are in order numerically.

22        THE COURT:  Excuse me.  Now, you, as I understood

23   it, wish to offer into evidence the document with respect to

24   his qualifications.

25        MS. CARMODY:  Yes, your Honor, and it's

1   listed.

2   Q.    Okay.  So when you prepared your report on February 17,

3   2004, what was the defendant's condition as you observed it

4   to be at that time?

5   A.    He was markedly improved.  He was no longer talking

6   about Alpha 1.  He was no longer talking about the conspiracy

7   against him to keep him incarcerated.  He was no longer

8   talking about the illegal activities that were occurring,

9   that he believed to be occurring in the institution.  He was

10  no longer talking about being a CIA agent or an NSA agent.

11  Q.    Had you had ongoing conversations with Mr. Ecker about

12  those issues during the course of time that you had treated

13  him from September of 2002 up until your report of February,

14  2004?

15  A.    Yes, I had.

16  Q.    Okay.  And so at some point in time during your

17  treatment of Mr. Ecker during that period, did you also talk

18  to him about attempting to restore him to competency?

19  A.    Yes.

20  Q.    And what were the conversations you had with Mr. Ecker

21  with respect to restoring his competency?

22  A.    Mr. Ecker was very interested in having his competency

23  restored.  I'm not sure I can exactly recall the details of

24  the conversations, but we had talked, and I had informed him

25  that I thought that he was competent to return to stand trial

S E A L E D   T R A N S C R I P T

1   for his charges.  We placed him in front of the risk

2   assessment panel.  They concurred that he appeared to be

3   competent at that time.

4   Q.   Did the risk assessment panel at that time also

5   determine whether or not he was still criminally dangerous?

6   A.   Yes, they did.

7   Q.   And what was that opinion at that time?

8   A.   It was their opinion that he still met the criteria as

9   being a danger to someone else or the property of someone

10  else.

11  Q.   So based on your evaluation in February of 2004 -- going

12  back a minute, would Mr. Ecker have reached that state of

13  what appeared to be competency in February, 2004, without the

14  aid of the injectable medications?

15  A.   It is my opinion that he would not.

16  Q.   Why not?

17  A.   Because we would have had no way to insure that he takes

18  the medication.  And, again, his general pattern is that he

19  will take the medication until he has substantially

20  improved.  He will then get himself switched to an oral

21  medication which he will not take.  Shortly thereafter he

22  begins his psychotic decompensation, and he continues to

23  decompensate.

24  Q.   And you base that observation over the entire time frame

25  which Mr. Ecker has been in custody from 1989 to your report

1    done in February of 2004?

2    A.    Correct.

3    Q.    Now, in 2004 in February, you rendered an opinion to

4    this Court that at that time Mr. Ecker was competent to stand

5    trial?

6    A.    That is correct.

7    Q.    And can you just tell the Court generally, what were the

8    reasons why you determined him to be competent at that time?

9    A.    As I said, Mr. Ecker had shown significant improvement.

10    His psychotic symptoms had appeared to resolve.  He was

11    talking in a goal-oriented, logical, coherent manner.  He was

12    not basing his decisions upon delusional beliefs, which he

13    had been doing before.  He was able to talk in a more

14    reasonable, civil manner with his attorney.  He clearly, I

15    mean, as now, he clearly understands what the charges are.

16    He clearly understands what the roles and functions of the

17    courtroom personnel are.  It was my opinion he could work

18    with his attorney because of his significant improvement and

19    work on a reasonable and rational defense for his charges.

20    Q.    Okay.  And as a result of that, there was a report to

21    the Court dated March 9, 2004, that indicated that he was now

22    competent to stand trial?

23    A.    That is correct.

24    Q.    Did some information come into your possession after you

25    wrote that report in February of 2004 that changed your

1    being able to confer with his client.  And then thereafter

2    the letter was written, May 9, also to the Court by the

3    defendant.

4    Q.    Okay, so on June 17, 2004, you provided an addendum to

5    the Court with respect to the status of Mr. Ecker's

6    competency; is that correct?

7    A.    That is correct.

8    Q.    And could you just tell the Court, generally speaking,

9    what was the reason for the addendum?

10   A.    It was the information that I had received, the letter

11   addressed to Judge Keeton, and again my -- at this time the

12   attempt to contact the federal employee took on a little

13   different meaning.

14   Q.    And why was that?

15   A.    Well, because he still continued to have the delusional

16   belief and wanted to assert that as his defense, it meant

17   that he still had a paranoic to paranoid delusional system.

18   The fact that he made attempts to contact the female would

19   also indicate that he had a continued, ongoing erotomatic

20   delusional system.  Although it decreased in intensity, it

21   still remained present.

22   Q.    So in this report, did you come to any firm conclusion

23   with respect to the defendant's competency at that time?

24   A.    No, I did not.

25   Q.    And what was your recommendation at that time?

SEALED  TRANSCRIPT

1    A.    My recommendation was that he be returned for another

2    competency evaluation.

3    Q.    Okay.  Now, at some point in time in June of 2004, the

4    defendant left your care in FMC Butner to return to

5    Massachusetts for court proceedings; is that correct?

6    A.    That's correct.

7    Q.    Okay.  When did he return to your care?

8    A.    That's correct.

9    Q.    When did he return to your care?

10    A.    In April on the 13th of 2005.

11    Q.    And have you provided the Court with an updated report

12    concerning the defendant's competency?

13    A.    I have.

14    Q.    Okay.  And that's a letter to the Court dated July 8,

15    2005; is that correct?

16    A.    That is correct.

17    Q.    And when did you actually conduct and finish your

18    report?

19    A.    It was finished on June 9, '05.

20    Q.    Okay.  And what did you do on June 10, 2005?

21    A.    Shortly thereafter, I left on vacation.

22    Q.    Okay.  And you returned when?

23    A.    I believe it was June 27.

24    Q.    Okay.  So before you went on vacation, you completed the

25    forensic evaluation which the Court has received dated

1    July 8, 2005; is that correct?

2    A.    That is correct.

3    Q.    What was the conclusion in your report dated July 8,

4    2005, with respect to Mr. Ecker's current status of legal

5    competency?

6    A.    That he was not competent to stand trial.

7    Q.    And why did you determine in June of 2005 that he was no

8    longer competent to stand trial?

9    A.    Mr. Ecker had shown increasing psychotic decompensation

10    over the time that he had returned.  His delusions had become

11    activated again.  He was making most of his decisions, if not

12    all his decisions, based upon his delusional beliefs.  And,

13    again, in my opinion, that would render him to be not

14    competent.

15    Q.    Now, I also want to call to your attention, Doctor,

16    Exhibit 4, which is a letter dated August 5, 2004, from the

17    defendant to the Court, and Exhibit 5, which is a letter

18    August 15, 2004, from the defendant to the Court.  And then

19    there is a letter which is Exhibit 6, April 28, 2005, a

20    letter from the defendant to government counsel, and May 18,

21    a letter from John Ecker to government counsel.

22           MS. CARMODY:  And also, your Honor, I haven't

23    marked it as an exhibit, again, because it was filed with the

24    Court, but if you would like it, I have one copy of it.  It's

25    the May 17, 2005 letter from the defendant to your Honor

SEALED  TRANSCRIPT

1     requesting present counsel, Attorneys Braceras and Neil

2     Smith, to stop representing the defendant.

3     Q.    In the context of your evaluation dated June of 2005,

4     did you take these letters which are now exhibits to the

5     Court into consideration in formulating your opinion as to

6     whether or not the defendant is presently competent?

7     A.    Those of which I had access to, yes.

8     Q.    Okay.  And some of them you've had access to since you

9     wrote the report?

10    A.    Correct.

11    Q.    Okay.  And looking at the letters in totality, did they

12    have any medical significance in your evaluation of

13    Mr. Ecker's present legal competency?

14    A.    As Mr. Ecker decompensates and as he becomes more

15    psychotic, he experiences increasing difficulty with his

16    attorneys, and that appears to be a pattern.  They run into

17    conflict.  He has an idea of what he wants to do in terms of

18    asserting his defense.  He runs into conflict with his

19    attorneys, who apparently do not wish to present this defense

20    for him.  That has been a pattern, as I can gather,

21    throughout the period of his incarceration and the ongoing

22    legal process.

23    Q.    And the defense is a defense based on a delusion?

24    A.    Correct.

25    Q.    And that delusion is in part that he has worked as an

1   agent for the CIA and/or the National Security Agency, the

2   NSA?

3   A.   Correct.

4   Q.   And as a result of that relationship, was authorized to

5   carry the firearm with which he is charged in this case?

6   A.   Correct.

7         MS. CARMODY:  Your Honor, I'd also bring to the

8   Court's attention the two letters that the government filed

9   last August 18, which is Docket Nos. -- I think it should be

10   169.

11         THE COURT:  Docket number what?

12         MS. CARMODY:  Hold on one second, your Honor.  Let

13   me confirm that.  Docket No. 169, your Honor, where the

14   government submitted to the Court the letters which the Court

15   requested us to get from both the CIA and the NSA confirming

16   that they had no relationship with the defendant.

17   Q.   And based on those letters and the defendant's present

18   status, will you tell the Court, please, why you believe him

19   to be legally not competent to stand trial at this time.

20   A.   I don't believe that Mr. Ecker has a rationally-based

21   decisional capacity.  His delusional system encompasses

22   almost -- it is -- it encompasses almost every aspect of his

23   life.  Hence, when he makes decisions, he uses the delusional

24   beliefs as the basis for those decisions.

25   Q.   And do those delusions result in his continued request

1    to the Court to dismiss whatever attorney happens to be

2    representing him presently?

3    A.    I believe that it does, yes.

4    Q.    Now, with respect to your report dated July 8, 2005, you

5    also request or recommend to the Court that the defendant

6    should be involuntarily medicated so that you might be able

7    to restore his competency; is that correct?

8    A.    That is correct.

9    Q.    Okay.  And that's in the case of United States V. Sal,

10   the Supreme Court case?

11   A.    Yes, it is.

12   Q.    And what was the basis for your recommendation -- first

13   of all, will the defendant submit to medication voluntarily

14   at this time?

15   A.    I do not believe that he will.

16   Q.    Have you requested him to do so?

17   A.    He has repeatedly refused.  He does not believe he has a

18   mental illness.  He refused -- I don't think that during this

19   period I have specifically asked him if he would be willing

20   to take medicine, based upon the fact that by inference,

21   based upon my past --

22            MR. BRACERAS:  Your Honor, I think he's answered

23   the question.

24            THE COURT:  All right, next question.

25   Q.    Based on your past experience with this defendant, what

SEALED   TRANSCRIPT

1    is your view as to whether or not he would submit voluntarily

2    to medication?

3    A.    I do not believe that he will.

4    Q.    Why not?

5    A.    Because he doesn't believe he has a mental illness.  He

6    doesn't think that there is anything wrong with him.  He does

7    not believe that he is in need for any treatment for a mental

8    illness.

9    Q.    Based on your experience and treatment of this

10    defendant, do you have an opinion, Doctor, to a reasonable

11    degree of medical certainty, as to whether or not oral

12    medications would be sufficient to restore him to mental

13    competency?

14    A.    I do not believe that they would.

15    Q.    Why not?

16    A.    I don't believe he'll take them.

17    Q.    And with respect to the involuntary medication of

18    injectable medication such as risperidone, if the Court were

19    to order that he be involuntarily medicated, do you believe,

20    based on your experience and medical training, that there

21    would be a substantial probability that he would be restored

22    to competency as a result?

23    A.    The reason I made the recommendation for the cell was

24    that in my report of February of 2004, I recommended that he

25    was competent to stand trial.  Upon receiving the

SEALED  TRANSCRIPT

1    information, I had some questions.  At that time I

2    recommended that we have another competency evaluation to see

3    if in fact he was competent.  He was transferred, had stopped

4    taking the medicine, and then was psychotic.  The reason for

5    that recommendation is to get him back to the state he was

6    when I saw him in 2004 in February and had recommended that

7    we have another evaluation.

8    Q.    Okay.  So in 2004, when he was involuntarily medicated,

9    he appeared to be competent at that time?

10   A.    Yes, he did.

11   Q.    However, after you issued that report, new information

12   came to light which in your own mind raised some question as

13   to whether or not that conclusion was the correct one?

14   A.    That is correct.

15   Q.    And now the defendant has refused to take medication

16   over a long period of time so that he is not in the state

17   today that he was when you issued the report in February of

18   2004?

19   A.    That is correct.

20   Q.    And it is your recommendation to the Court, as I

21   understand it, that if he were involuntarily medicated, you

22   would be able to take him back to the state he was in

23   February of 2004, and based on all of the information that

24   you now know, determine whether even under those

25   circumstances he would be competent to stand trial or not?

S E A L E D    T R A N S C R I P T

1    A.    That is correct.

2    Q.    And so your recommendation to the Court is to allow you

3    the opportunity to do that; is that correct?

4    A.    If the Court should so choose.

5    Q.    Okay.  And do you have a view, Doctor, based on all of

6    the information that has now come to you and the documents

7    that you reviewed, even the exhibits that you've reviewed for

8    the Court today, as to whether or not there's a substantial

9    probability that his competency can be restored at all?

10            MR. BRACERAS:  Objection, your Honor.  Asked and

11    answered.

12            THE COURT:  I think this is a little different

13    question.  You may answer.

14            THE WITNESS:  Thank you, your Honor.

15    A.    I have some questions about whether his competency can

16    be restored, given the fact that I thought he was competent

17    at the time.  However, he continued to have some residual

18    psychotic symptoms that remain even when he is adequately

19    treated.  This casts some doubt upon whether there is a

20    substantial probability that he can be restored to

21    competency.  There is a likelihood, a chance, but I don't

22    know that there exists a substantial probability.  I would

23    not be able to know unless I would get him back and

24    reevaluate him.

25            MS. CARMODY:  Thank you, your Honor.  I have

S E A L E D   T R A N S C R I P T

1    Q.    Now, in February, 2004, Mr. Ecker was being medicated?

2    A.    Correct.

3    Q.    Now, when he was still on medication, after February of

4    2004, he was -- let me -- a bad question.  Let me ask this

5    again.  Mr. Ecker was put on medication in February, 2004,

6    correct?

7    A.    No.  In January of 2003.

8    Q.    But he was still on medication in January, 2004?

9    A.    He was on medication until he left the institution in

10    June of 2004.

11    Q.    Now, Exhibit 3, the letter written to the Court, is

12    dated May 9, 2004.

13    A.    Correct.

14    Q.    Do you see that?

15    A.    I do.

16    Q.    Mr. Ecker was on medication at that time, correct?

17    A.    Yes, he was.

18    Q.    And Exhibit 3 is part of the information that now makes

19    you question your competency evaluation two months prior to

20    that, correct?

21    A.    That is correct.

22    Q.    The communication that he had with this female in

23    December, 2003, was made at a time when Mr. Ecker was on

24    medication?

25    A.    That is correct.

SEALED  TRANSCRIPT

1    Q.    And that is another piece of information that is now

2    raising some questions in your mind?

3    A.    When I received this letter, the importance of that

4    information did change.

5    Q.    And when Mr. Ecker raised questions about his prior

6    counsel, Mr. Walker, those questions were raised when

7    Mr. Ecker was still on medication, correct?

8    A.    I'm not sure that there were any communications -- once

9    Mr. Ecker was treated, I'm not sure that there were any

10   communications -- and you might be able to correct me if I'm

11   wrong -- regarding Mr. Walker and his belief about him.

12   Things seemed to stabilize once he was treated with

13   medication.

14   Q.    Yet he had this communication with this woman and wrote

15   this letter to the Court at a period when he was on

16   medication?

17   A.    That is correct.

18   Q.    If you look at Exhibit 3, Dr. Lucking, the third page,

19   you will see that Mr. Ecker on Pages 3 to 4 is requesting

20   that the Court remove Mr. Walker from representing him?

21   A.    Yes, that is correct, yes.

22   Q.    So the issues between Mr. Ecker and his counsel

23   certainly existed or began at a time when Mr. Ecker was being

24   medicated?

25   A.    Well, they continued, obviously, yes.

SEALED   TRANSCRIPT

1        MR. BRACERAS:  Nothing further, your Honor.

2        THE COURT:  All right.

3        MS. CARMODY:  I have nothing further for

4    Dr. Lucking, your Honor.

5        THE COURT:  All right, you may step down.  Thank

6    you very much.

7        THE WITNESS:  Thank you, your Honor.

8        (Witness excused.)

9        MS. CARMODY:  I do have the report to the Court.

10   We checked with both the FBI as well as the Marshals Service

11   that transported the defendant, and we are advised that

12   Mr. Ecker was taken by the Marshals to Essex County when he

13   was transferred here from Butner, and then was taken from

14   Essex directly to the courthouse this morning.  From the

15   Marshal's information, he did not meet with any FBI agents

16   while at Essex.

17        We also contacted the FBI.  The FBI also

18   communicated with their agents, and no one responded that

19   they had any contact with Mr. Ecker.  So, to our knowledge,

20   the statement I made to the Court before was correct.

21        THE COURT:  Thank you.  All right, now, with

22   respect to representation, I will find that there is no

23   conflict of interest here that precludes counsel to continue

24   representation, and therefore I deny the request by Mr. Ecker

25   that his counsel be discharged.  I think it is also important

1  to keep the present counsel in the case in the present

2  circumstances because Mr. Ecker is, in my view, and I so

3  find, plainly not competent to represent himself, and it is

4  important to have counsel available to represent him.

5       Now, also I find that Mr. Ecker is not now

6  competent to stand trial, and that it is my present finding

7  that it is not foreseeable that he will be likely to become

8  competent to stand trial anytime in the near future, so it is

9  impossible in those circumstances for me to schedule a

10  trial.  And that's where matters stand at this point.

11       THE DEFENDANT:  May I interject, sir?

12       THE COURT:  You may speak, Mr. Ecker.

13       THE DEFENDANT:  I have no response at this time to

14  the attorney for the government's assertions on the alleged

15  communications with the U.S. Marshals Service or the FBI.

16       On the -- some of the things that -- issues that --

17       (To Mr. Braceras)  No, I've heard enough out of

18  you.  Now, the Judge gave me permission to address the

19  Court.  It is now my turn.

20       I think on the issue of competency, as I stated

21  before, the issue of competency is one that is a legal

22  standard decided by the Judge and is not a medical

23  recommendation.  I think that I clearly stated to the

24  attorneys on both sides and to the doctor for the Bureau of

25  Prisons, and to other individuals, that the original

1          MS. CARMODY:  Just one clarification for the

2    record, your Honor.

3          THE COURT:  Yes.

4          MS. CARMODY:  I'm assuming that in your finding,

5    that you're finding that involuntary medication wouldn't

6    assist in coming to that conclusion as well.

7          THE COURT:  Absolutely, yes, that would not make it

8    possible for the defendant to be competent to stand trial, to

9    assist his counsel as his counsel would need it, or to try

10   the case on his own behalf as he has sought as an alternative

11   to having counsel represent him.  So present counsel remains

12   as his appointed counsel.  I find no conflict of interest

13   that would call for any modification of that.  That's where

14   matters stand.  We'll be in recess.

15         MR. BRACERAS:  Thank you, your Honor.

16         MS. CARMODY:  Thank you, your Honor.

17         THE CLERK:  All rise.

18         (Adjourned, 1:18 p.m.)

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

     UNITED STATES DISTRICT COURT )
4    DISTRICT OF MASSACHUSETTS    )  ss.
     CITY OF BOSTON               )
5

6

7

8           I, Lee A. Marzilli, Official Federal Court

9    Reporter, do hereby certify that the foregoing transcript,

10   Pages 1 through 67 inclusive, was recorded by me

11   stenographically at the time and place aforesaid in

12   Criminal No. 89-30028, United States of America Vs. John

13   Leonard Ecker, and thereafter by me reduced to typewriting

14   and is a true and accurate record of the proceedings.

15          In witness whereof I have hereunto set my hand this

16   22nd day of August, 2005.

17

18

19

20

21

22          _____
            LEE A. MARZILLI, CRR
23          OFFICIAL FEDERAL COURT REPORTER

24

25