J



U. S. Department of Justice

Federal Bureau of Prisons

*FCC Butner*

---

P. O. Box 1500
*Butner, NC 27509*

March 9, 2004

Tony Anastas, Clerk of Court
United States District Court
District of Massachusetts
2300 United States Courthouse
One Courthouse Way
Boston, Massachusetts 02210-3002

RE:   ECKER, John
      REGISTER NUMBER:   90050-038
      DOCKET NUMBER:     89-30028-K

Dear Mr. Anastas:

Please find enclosed a Certificate of Restoration of Competency to Stand Trial on the above referenced individual.

Mr. Ecker was previously evaluated and found not competent to stand trial under the provisions of Title 18, U.S. Code, Section 4241. He was subsequently recommitted under the provisions of Section 4241(d), for continued hospitalization and treatment in an effort to restore his competency to stand trial. On April 16, 1993, he was found to be not restorable. On October 16, 1993, he was found to be dangerous to the person and property of others pursuant to Title 18, USC, Section 4246 in the District of Minnesota. Mr. Ecker's commitment has been subsequently transferred to the District of Massachusetts and assigned to District Judge Robert E. Keeton, following his transfer to the Federal Medical Center in Devens, Massachusetts. Mr. Ecker was subsequently transferred to the Federal Medical Center at Butner, North Carolina. Since his arrival at this facility, Mr. Ecker has been receiving treatment for his mental illness on a consistent basis and has had a positive response. Mr. Eckerd is now competent to stand trial and our report reflecting this opinion will be forwarded to the Honorable Robert E. Keeton, United States Judge for the District of Massachusetts, on this date.

This Certificate is being filed with your office pursuant to Title 18, United States Code, Section 4241(e). Thank you for your assistance in this matter.

Respectfully,

A.F. Beeler
Warden

Enclosures

cc:     Mary Carmody, Assistant United States Attorney
        Owen Walker, Federal Public Defender

## CERTIFICATE OF RESTORATION OF COMPETENCY
## TO STAND TRIAL

This is to certify that John Ecker, Register Number, 90050-038, is able to understand the nature and consequences of the proceedings against him and to assist properly in his own defense. This certification is made and filed with the Clerk of the Court pursuant to Title 18, United States Code, Section 4241(e).

In accordance with Section 4241(e), the Clerk of the Court should mail a copy of this certificate to the defendant's counsel and to the attorney for the Government.

_____
A.F. Beeler
Warden
Federal Medical Center
Butner, North Carolina


Subscribed and sworn before me this 9th day of March, 2004.

_____
Notary Public

My Commission expires  5/2/2006

ANNUAL UPDATE
Mental Health Department
Federal Medical Center
Butner, North Carolina

**NAME:**              ECKER, John
**REGISTER NUMBER:**   90050-038
**DOCKET NUMBER:**     3-93-298
**DATE OF BIRTH:**     08/05/60
**DATE OF REPORT:**    02/17/04

**IDENTIFYING INFORMATION:** Mr. John Ecker is a 43-year old, single white male, from Wilbraham, Massachusetts. He was admitted to the Mental Health Department of the Federal Medical Center (FMC) in Butner, North Carolina on 09/19/02, as a transfer from the Federal Medical Center (FMC) Devens, Massachusetts related to inmate management issues for stalking a female staff member and threatening the Chief of Psychiatry. Mr. Ecker was originally charged with being a Felon in Possession of a Firearm in the District of Massachusetts in October 1989. Mr. Ecker underwent a psychiatric evaluation for competency/restoration of competency on at least seven occasions during the period from October 1989 to March 1993. Each of the evaluations, with the exception of the evaluation conducted in July 1991, concluded Mr. Ecker was not competent and not likely to be restored to competency. On April 16, 1993, Robert Keeton, United States Magistrate Judge for the District of Massachusetts found Mr. Ecker was not restorable to competency. In October 1993, Mr. Ecker was committed to the custody of the Attorney General pursuant to Title 18 United States Code, Section 4246 by Paul A. Magnuson, United States District Judge for the District of Minnesota, Third Division. Mr. Ecker has remained in the custody of the Attorney General since that time. On 07/20/01, this case was transferred to the United States District Court for the District of Massachusetts. Mr. Ecker is represented by Owen Walker, of the Federal Public Defenders Office and the Assistant United States Attorney assigned to the case is Mary Carmody.

**DATES OF CONTACT AND PROCEDURES ADMINISTERED:** During this evaluation Mr. Ecker was seen individually by Robert G. Lucking, M.D., Staff Psychiatrist, with psychological consultation provided by Angela Walden-Weaver, Ph.D., Staff Psychologist. Other members of the Forensic Team, Correctional, and Mental Health Staff had the opportunity to observe his behavior throughout the course of his evaluation. Their observations and comments were considered prior to the preparation of this report.

Page 1 of 14

Mr. Ecker also underwent a routine physical examination and laboratory studies. The following procedures were administered during this evaluation:

Clinical Interviews (ongoing)
Behavioral Observation (ongoing)
Physical examination (09/19/02)
Risk Assessment Panels (11/18/03 and 01/12/04)

**BACKGROUND INFORMATION:** Mr. Ecker has voluminous records from his extended stay in the Bureau of Prisons. Thus it is not practical to present a complete review of these records. Therefore, a brief review of the information felt to be pertinent is presented below.

Mr. Ecker's first psychiatric hospitalization was in 1974 at the age of 14. He was hospitalized at Northampton Hospital (NHH) in Massachusetts after constructing a wick for a fire bomb in the gas tank of a neighbor's car and also threatening to obtain a gun to kill the neighbor and the neighbor's father. He was subsequently hospitalized at McLean Hospital where he was diagnosed as Schizophrenia, Childhood Type. He was transferred back to NHH, but escaped within a day. Mr. Ecker was again admitted to NHH for a competency evaluation in early 1975 and was diagnosed as Explosive Personality. In August 1979, Mr. Ecker was charged with Assault and Battery with a Dangerous Weapon after allegedly attacking a man with a hammer after finding him with his girlfriend. Mr. Ecker was subsequently evaluated at NHH where he was diagnosed as Antisocial Personality Disorder. He was convicted of this charge and sentenced to 10 years in custody. Mr. Ecker was subsequently paroled in January 1984, however, his parole was revoked in May 1984, after leaving threatening and obscene messages on his female parole officer's telephone and failing to comply with court ordered psychiatric treatment. Mr. Ecker was concurrently sentenced in September of 1984, to three years following a conviction for Arson in Baltimore, Maryland (a crime while on parole). He was released from the Massachusetts Department of Corrections in September 1988. During the period of his incarceration he was committed to Bridgewater Hospital for psychiatric treatment on at least six occasions for treatment of psychotic symptoms. During these periods of hospitalization his institutional adjustment was described as erratic, paranoid, hostile, and threatening. He was involved in multiple assaults, writing inappropriate letters to a female staff member expressing his affection for her, and informing the staff about drug trafficking while believing himself to be a narcotics agent.

Mr. Ecker was diagnosed as Paranoid Personality Disorder.

During his first evaluation in 1989 at FCI Butner, Mr. Ecker was diagnosed as Probable Bipolar Disorder, NOS, Paranoid Personality Disorder, and Antisocial Personality Disorder. By 1993, Mr. Ecker exhibited active delusional beliefs talking about conspiracies against him by the CIA, FBI and BOP. He also believed staff of the BOP institutions were involved in the conspiracies. The diagnosis was changed to Schizophrenia, Paranoid Type and Personality Disorder NOS, with paranoid, antisocial traits. The diagnosis on Axis II had been changed to Antisocial Personality Disorder.

Mr. Ecker has been housed at all of the BOP medical referral centers during the course of his commitment. In 1989, he was housed at FCI Butner for a forensic evaluation. During the period from October 1990 to August 1992 he was housed at the United States Medical Center for Federal Prisoners (USMCFP) in Springfield, Missouri. During the period from August 1992 to April 1994, Mr. Ecker was again housed at the FMC Rochester. During the period from April 1994 to July 1999 he was again housed at the USMCFP. During the period from July 1999 to January 2003, Mr. Ecker was housed at FMC Devens. He remained at FMC Devens until January 2003 when he was transferred to FMC Butner. At each of these facilities, Mr. Ecker has developed romantic and erotic fixations on female staff members which was one of the major causes for his being transferred to another institution. Mr. Ecker has a long history of erotomanic delusions involving staff members at the institutions at which he has been housed. Beginning with his initial evaluation at FCI Butner in 1989, he has developed sexualized and romantic fantasies involving female staff members. These delusional relationships increase in intensity over time and become an integral part of his delusional system. He sends the female staff members inappropriate letters, stalks them at the institution, and obtains their home addresses sending them gifts. The erotomanic delusion escalates to the point where it is problematic at the institution and the female staff member becomes frightened to the point Mr. Ecker must be transferred to another institution.

Mr. Ecker has not been compliant with his medication throughout his stay in BOP custody. He has been given injectable depot antipsychotic medication which results in adequate control of his psychotic symptoms. However, when he has improved, he is generally changed to an oral antipsychotic agent with which he is noncompliant. While he states he is compliant with the

Page 3 of 14

medication he will engage in devious and deceitful behavior to avoid taking the medication. The result of this is a return of his psychotic symptoms and behavior which is unmanageable in the institution. Mr. Ecker has a complex intricate paranoid delusional system which resolves around government agencies and "alpha one." The delusions involve the staff of the BOP facility at which he is housed, illegal activities which he believes to be occurring at the facility, and retaliation against himself and the staff member involved with his erotomanic delusions. During these times of active psychosis, Mr. Ecker requires extended periods of housing in a restricted housing unit and an increase in the level of monitoring as he attempts to violate institution rules and procedures to pursue his delusional beliefs.

Mr. Ecker has a chaotic institutional record. He has received at least thirteen 200 level incident reports for threatening bodily harm or assault. Mr. Ecker also has received at least four 100 level incident reports for assault with serious injury and possession of a dangerous weapon. Additionally, he has received at least seven 200 level incident reports for attempting to bribe staff. During his stay at FMC Devens, Mr. Ecker attempted to secure a knife from an inmate assigned to food service to use as a weapon for an assault. It appears much of this behavior occurs when Mr. Ecker is not adequately medicated with antipsychotic medication.

Mr. Ecker was informed the usual confidentiality between doctor and patient would not exist. He was further informed the information obtained from the evaluation would be summarized in a report and submitted to the court. Mr. Ecker acknowledged his understanding of this and agreed to proceed with the evaluation.

*[handwritten margin note: re this annual update 1/?/03]*

**COURSE IN INSTITUTION:** Mr. Ecker was initially screened in the Receiving and Discharge Department and was admitted to the Admission/Seclusion Unit where he remained for an extended period due to his active psychotic symptoms and their effect upon him. He disclosed his medical history and underwent a routine physical examination and laboratory studies. Medical history was non-contributory with the exception of stable gastroesophageal reflux disease, resolved rectal fissure and stable asthma now without medication. Physical examination was felt to be normal for an individual his age. Vital signs revealed a blood pressure of 134/88, pulse was 74 and temperature and respirations were within the normal range. At the time of admission, Mr. Ecker was prescribed mirtazapine 15mg at night and quetiapine 100mg at night.

Routine laboratories as part of the annual physical examination revealed the following: PPD on 09/05/03, was negative; urinalysis was within normal limits; serology for syphilis was negative; complete blood count was within normal limits; HIV antibody was negative; thyroid studies were within normal limits; blood chemistries were within normal limits; PSA-hyb was within the normal range; valproic acid level ranged from 60.6ug/ml to 95.7ug/ml; serial liver function tests and blood counts as part of the ongoing monitoring for valproic acid were within the normal range.

The mental status examination at the time of the initial evaluation revealed a 43-year old, white male who looked his stated age. Dress and grooming were adequate. Psychomotor activity was within the normal range. Eye contact was felt to be normal. Facial expression was responsive. Attitude toward the examiner was guarded, suspicious, and defensive. He was oriented to person, place, and time. Cognitive functions were not formally assessed, but appeared to be adequate to informal observation and educational level. Affect was appropriate to the content of the conversation. Range of affect was adequate. Mood was euthymic. Mr. Ecker denied a subjective sense of depression and denied the neurovegetative signs of depression. He denied mood swings. He denied mania/hypomania and associated signs. There were no speech or language deficits apparent. He denied hallucinations and delusions. At the time of the initial screening there was no evidence of an overt thought disorder of content. No delusional material was evident during the initial screening. There was no evidence of a thought disorder of form. Conversation was linear, logical, and goal oriented. He denied suicidal, homicidal, or aggressive thoughts, plans or intent.

Mr. Ecker was placed in the 1-E unit for observation due to the report of his noncompliance with medication and the behavioral problems associated with his noncompliance, particularly the risk for physical aggression directed against others.

Initially, Mr. Ecker was guarded and evasive, refusing to give any substantial information about himself. As he became more comfortable over the course of several months, Mr. Ecker began to speak of his delusional belief that revolved around top secret files coded "alpha-1" which pertained to the disappearance and murder of scores of women around the country. Mr. Ecker's paranoid delusional system can be summarized as follows:
Mr. Ecker believed he was made an agent of the CIA in 1984.
Mr. Ecker believed in 1984 he was contacted by the CIA in Massachusetts and put into contact with a Miss Terry Brashear

after numerous telephone conversations with the CIA. Mr. Ecker believed he was sanctioned by Agent Brashear to carry the firearm as an agent of the CIA during his employment by a detective agency. He stated since he was legally allowed to carry a firearm, he should not have been arrested for the instant offense of being a Felon in Possession of a Firearm. In March 1992, Miss Brashear "showed up" as a case manager intern while Mr. Ecker was housed at USMCFP. Mr. Ecker believed she and three other women disappeared from Springfield, Missouri in June 1992. Mr. Ecker claimed while he was at FMC Devens he was visited by a colonel from the NSA internal affairs who confirmed the existence of "alpha-1." This colonel also informed him all the women in Springfield including Ms. Brashear were dead and the "alpha-1" file was sealed by Louis Freeh and Janet Reno. Mr. Ecker believed medical staff were being instructed how to interact with him and were being used as "tools" to cover-up the wrong doing "certain" individuals were involved in. This resulted in his continued hospitalization as a committed individual under Title 18 United States Code Section 4246. He believed a document existed that specifically instructed the medical staff how to respond to his questions.

As a result of his "illegal detention," Mr. Ecker made multiple requests/demands that he be released or allowed to escape during escort to the parking lot. He stated the CIA should be contacted for notification and assistance with these arrangements. He offered monetary compensation to the staff to make the arrangements. Additionally, he promised the staff that they would not be charged for aiding in his escape and there would be legal repercussions for those who did not help him. Mr. Ecker made repeated demands to call the CIA and the Canadian Embassy to attempt to secure his release. He believed as a result of his placement in seclusion at FMC Devens, classified information had been leaked to the organized crime syndicate. As a result of this leakage of this classified information a female employee at FMC Devens who he claimed was his wife (J.C.), under pressure, threats, and blackmail by the organized crime syndicate, the CIA, and NSA had been forced to make x-rated videos and forced to perform sexual acts. Mr. Ecker reported communication he had received while at FMC Devens regarding J.C., had caused unbearable pressure on him and "had resulted in further leakage of information to alien nations, this time Algeria." While at FMC Butner, Mr. Ecker made frequent reference to his wife, (J.C) a female employee at FMC Devens. He claimed to have asked her to marry him while he was housed at FMC Devens and she had accepted

his offer. He also reported he had seen J.C. at FMC Butner, but was not allowed to visit with her, alluding to his belief that the videos and sexual acts were being conducted here.

Although he denied experiencing any auditory hallucination, Mr. Ecker reported he was receiving information regarding "alpha one" both verbally and by written message. He was also observed and overheard to talk to himself for extended periods of time about his delusional beliefs as if conducting a dialogue with another individual. Mr. Ecker also spent many hours drafting letters and correspondence to attorneys and also wrote letters to Bill Gates and President Bush outlining his delusional beliefs and requesting their help in his release.

Mr. Ecker also showed symptoms of mania. He showed a marked increase in energy (engaging in excessive exercise in his cell), did not sleep for extended periods and showed evidence of pressure speech and euphoria.

Mr. Ecker refused to consent to take additional antipsychotic medication claiming he did not need it as he did not have a mental illness. It was explained to him that 100mg of quetiapine was a subtherapeutic dose of medication. He refused to accept an increase in the dosage. An attempt was made to discuss with him the use of ziprasidone, however, he refused to accept a therapeutic dose of oral ziprasidone. As a result of his refusal to accept treatment with oral antipsychotic agents despite repeated attempts to gain his compliance the decision was made to treat him involuntarily with an injectable depot antipsychotic medication. After consultation with the Assistant United States Attorney assigned to FMC Butner, it was determined the involuntary medication hearing held in August 2000 at FMC Devens sufficiently protected his legal rights and he could be administered the antipsychotic on an involuntary basis. The Chief of Psychiatry concurred with the need for treatment on an involuntary basis. On 01/02/03, Mr. Ecker received his first injection of haloperidol decanoate 150mg. He received additional injections on 01/21/03 and 02/10/03. He then received regular injections of haloperidol decanoate 150mg every four weeks. With the use of haloperidol Mr. Ecker showed a significant decrease in the intensity of his psychotic symptoms. In a relatively short period he was released to the open housing unit on 02/11/03. Mr. Ecker complained of nonspecific physical symptoms, such as restlessness which he believed to be related to the haloperidol. In an effort to manage these symptoms, Mr. Ecker was treated with propranolol 20mg three times daily and trihexyphenidyl 2mg three times daily. Mr. Ecker reported only

limited benefit from the additions of these medications. Due to this limited response, he requested a change in the medication to fluphenazine decanoate. He was treated with fluphenazine decanoate 50mg intramuscularly every to weeks until September 2003 when it was decreased to 37.5mg every two weeks. In December 2003, a long acting depot form of risperidone became available and Mr. Ecker was begun on Risperdal (Consta) 25mg every two weeks in early January 2004. In August 2003, Mr. Ecker agreed to begin a trial of valproic acid which was felt to be indicated for the manic symptoms he exhibited while in the 1-E unit, with the intent to decrease the amount of antipsychotic medication he was receiving. Mr. Ecker was begun on valproic acid 750mg daily. This was increased to a total dosage of 500mg twice daily achieving a adequate therapeutic level.

Since his release to the open housing unit, Mr. Ecker has made a good adjustment. He has been involved in educational activities, attending classes offered by the educational department. He has followed institution rules and procedures without problems. He did not require any restraint or seclusion. He did not receive any incident reports. He did not require administrative detention or disciplinary segregation. He did not engaged in any conflictual adversarial interactions with peers or staff. He did not volunteer to work. He did not participate in any of the groups or activities offered by the Rehabilitative Services Department. He was observed to socialize with his peers.

On 11/18/03, the primary clinician presented Mr. Ecker to a risk assessment panel for review. Present at the panel were the Chief Psychiatrist, Chief of Psychology, and the lead Social Worker. After presenting a brief history, Mr. Ecker was questioned by the members of the panel. It was the opinion of the members of the risk panel that Mr. Ecker continued to represent a danger to others and he appeared to have regained his competency. On 01/12/04, he was again interviewed by the risk assessment panel. This was prompted by complaints from a female employee that she had been contacted by Mr. Ecker through one of his attorneys regarding their relationship. Mr. Ecker was questioned by the members of the panel. He was guarded and evasive in providing answers, but it was evident to the panel members Mr. Ecker had devised a sophisticated and well thought out plan to avoid violating any of the BOP policies. It was again the opinion of those present that Mr. Ecker met the criteria for commitment under Title 18 United States Code, Section 4246. However, he again appears to have attained competency.

**IMPRESSIONS**: According to the *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision (DSM-IV-TR)*, we have diagnosed Mr. Ecker as follows:

Axis I:    Schizophrenia, Paranoid Type, Continuous, 295.03
Axis II:   No Diagnosis, V71.09
Axis III:  Gastroesophageal Reflux Disease by history
           Asthma by history
           Rectal Fissure, Resolved
Axis IV:   Psychosocial and Environmental Problems: Problems
           related to interaction with the legal system/crime
           Arrest for the instant offense
Axis V:    Global Assessment of Functioning Scale:
           Score: 90

The essential feature of Schizophrenia is the presence of a mixture of characteristic signs and symptoms which distort the perceptions of reality and are associated with marked impairment in functioning in a variety of areas (social, occupational, educational, self-care, interpersonal, financial, parental, and marital). The characteristic symptoms of Schizophrenia involve a range of cognitive and emotional dysfunctions that include perception, inferential thinking, language and communication, behavioral monitoring, affect, fluency and productivity of thought and speech, hedonic capacity, volition and drive, and attention. There is no single pathognomonic symptom of Schizophrenia and the diagnosis involves the recognition of a constellation of signs and symptoms associated with impairment in social and occupational functioning.

Characteristic symptoms fall into two broad categories - positive and negative. Positive symptoms fall into the following categories. First, delusions which may include a variety of themes, such as persecutory, referential, somatic, religious, or grandiose. Second, hallucinations which can occur in any sensory modality (auditory, visual, olfactory, gustatory, or tactile, of which auditory are the most common). Third, cognitive disorganization which is exhibited in speech and reflects a disorder in the associative processes which guide thinking and in which too many associated ideas come into consciousness as the result of too little selective suppression. It may take a variety of forms which range from mild to severe. This process destroys the value of speech as an effective means of communicating with others. Thought and speech may become inexact, vague, diffuse and unfocused. On a more severe level, speech may diverge or digress from the topic at hand so that it appears unrelated or irrelevant, may become incomprehensible and

disconnected, jumping from topic to topic so as to appear as totally disconnected words. The individual is insensitive to the contradictions, illogicality, and incomprehensibility of his/her speech. Fourth, grossly disorganized behavior which is exhibited in a variety of ways such as child-like silliness, unpredictable agitation, collecting garbage, dressing in an unusual manner, talking to one's self in public, inappropriate sexual behavior, or hoarding food, bizarre dress and appearance, or repetitive-stereotyped behavior. Of the positive symptoms, Mr. Ecker exhibits the presence of delusions and auditory hallucinations. He does not show any evidence of cognitive disorganization or grossly disorganized behavior. Even when he was most symptomatic while being housed in the 1-E unit Mr. Ecker's conversation, although delusional was well organized and goal directed. His behavior was also organized and goal directed.

Negative symptoms fall into the following categories. First, affective flattening (restrictions in the range and intensity of emotional expression, unchanging facial expression, decreased spontaneous movements, paucity of expressive gestures, poor eye contact, affective nonresponsivity, inappropriate affect, and lack of vocal inflections). Second, impoverished thinking or diminution of thoughts that is evidenced by which is inferred from observing speech and language behavior fluency and productivity of thought and speech (decreased fluency and productivity of speech, speech is manifested by brief, terse, empty replies, responses devoid of meaning, blocking of thoughts, and increased in the time of response). Third, the inability to initiate and persist in goal-directed activities (impaired grooming and hygiene, inability to maintain and persist at activities such as work or school, physical immobility (sitting for long periods of times) which may lead to difficulties in performing activities of daily living such as preparing a meal or maintaining hygiene. Fourth, decreased social interaction and decrease in the ability to experience pleasure from activities (little interest or participation in recreational activities, little interesting or participation in sexual activity, impaired intimacy and closeness, and few relationships with others). Fifth, difficulties with attention which is related to the persistence in goal directed activities(social inattentiveness, easy distractibility, difficulty concentrating, and difficulty finishing tasks). Although common, negative symptoms are difficult to evaluate as they occur on a continuum with normal behavior, are relatively nonspecific, and may be due to factors other than Schizophrenia. Mr. Ecker did not exhibit any of the negative symptoms of Schizophrenia.

Case 1:89-cr-30028-NMG   Document 189-12   Filed 10/24/2005   Page 14 of 17

**RISK ASSESSMENT**: Title 18 United States Code, Section 4246 outlines procedures for indefinite civil commitment of a person who has been found not competent to stand trial and not restorable to competency or whose charges have been dismissed and who is presently suffering from a mental disease or defect, such that his release would crease a substantial risk of bodily injury to another person or serious damage to the property of another and suitable arrangements for State custody and care of the person are not available. Mr. Ecker is currently at FMC Butner pursuant to this statute. It is the clinical team's opinion Mr. Ecker does represent a substantial danger to others or their property due to mental illness. It should be kept in mind that because violence is situational and depends on the confluence of specific factors and events, the prediction of future violence is very difficult and declines in accuracy over time. The opinion for Mr. Ecker is based upon the following:

1. <u>Past history of violence</u>: The prediction of future violence is difficult, however, a past history of violence serves as the single best predictor. Mr. Ecker has a long history of violence of a serious nature dating back to his teenage years and his arrest for Assault and Battery with a Dangerous Weapon. Mr. Ecker also has several other arrests for crimes of violence including Arson and Burglary. Mr. Ecker has also exhibited physically aggressive behavior directed against others while in the correctional setting. He has received multiple incident reports while in the BOP for assault and possession of dangerous weapons.

2. <u>Mental Illness or Defect</u>: Many forms of mental illness have been shown to increase the risk for violence. The diagnosis of a psychotic illness is one such mental illness. Hallucinations and delusions are generally considered to correlate positively with the risk for violent behavior. Delusions correlate most closely with aggressive behavior. Among the delusions threat and control override delusions, persecutory delusions and systematized delusions are all felt to increase the risk for violence. Mr. Ecker has an intricate and well formed paranoid persecutory delusional system. These psychotic beliefs are, in part responsible for his aggressive behavior. When not treated with antipsychotic medication Mr. Ecker's perceptions are extensively influenced by his delusional beliefs. As a result he bases his actions, decisions, and behavior upon these delusional beliefs. During actively psychotic states he frequently perceives others as enemies who are out to harm him and acts in a manner which he justifies as

Page 11 of 14

protecting himself. Since his release from the 1-E unit he has been treated with antipsychotic medication and has not engaged in any aggressive behavior. This is complicated by the fact Mr. Ecker does not believe he has a mental illness and, therefore, does not believe he is in need of treatment with psychotropic medication. While he does not openly express this belief he continues to make comments that indicate he does not recognized the extent of his mental illness. An example of this is his failing to acknowledge that the delusional system described above is just that, a delusional system. He continues to express his belief the events at USMCFP in 1992, with the missing women did occur. Although there are no obvious side effects present and he does not exhibit any of the behavior which generally accompanies these side effects, Mr. Ecker also continues to complain of unpleasant effects of the antipsychotic medication. These complaints are believed to reflect his desire to be changed to a medication with "less side effects" particularly an oral agent. Attempts to treat Mr. Ecker with an oral antipsychotic agent have been uniformly unsuccessful as he eventually becomes noncompliant with the medication. The result of this is return of his psychotic symptoms and a resurgence of his aggressive behavior. While treated with an appropriate dose of antipsychotic medication Mr. Ecker is able to control his aggressive behavior, without antipsychotic medication he represents a major risk for aggressive behavior. Another indication of the continued presence of his delusional beliefs is his attempt to contact the female employee at FMC Devens.

3. <u>Substance abuse</u>: Substance abuse is a well known risk factor for violent or aggressive behavior. Mr. Ecker does not appear to have a significant substance abuse problem.

4. <u>Weapons</u>: Mr. Ecker has a significant history of arrest for crimes with the use of a weapon. The arrest resulting in his federal charges is being a Felon in Possession of a Firearm. He has offered a delusional explanation for carrying the firearm, stating it was sanctioned by the CIA as part of his job as an agent for that agency. He has also been in sanctioned for being in possession of dangerous weapons while in the BOP. It is reasonable to suspect if his paranoid delusional system becomes active he will feel the need to possess a weapon to protect himself.

5.  <u>Social Support</u>: Social support plays a role in decreasing the risk for future violence. Mr. Ecker has family members with whom he has contact, his mother and his brother who will likely provide him with at least some social support.

6.  <u>Institutional Adjustment</u>: When appropriately medicated, Mr. Ecker's institutional adjustment appears to be good. However, when not appropriately medicated, Mr. Ecker's institutional adjustment is considered to be poor and he is unable to maintain placement in an open housing unit.

Base upon the above it is the opinion of the primary evaluator and risk assessment panel Mr. Ecker continues to meet the criteria for commitment pursuant to Title 18, United States Code, Section 4246. It is the opinion of the Forensic Team, Mr. Ecker has now gained competence to stand trial. Mr. Ecker possesses an adequate and factual understanding of the charges against him. He has an adequate understanding of the pleas available to him and the consequences of each. Mr. Ecker understands the seriousness of his legal difficulty at this time. He understands the roles and functions of the courtroom personnel. He exhibits a reasonable understanding of the adversarial nature of the courtroom proceedings. Mr. Ecker understands the procedure for challenging witnesses. There are no major psychiatric symptoms currently present which would prevent him from working with his attorney to plan a legal strategy. While Mr. Ecker appears to continue to have delusional beliefs, these are markedly decreased in intensity and are not pervasive in every aspect of his thinking. He is able to think and talk about his legal issues without the intrusion of delusional material. His judgements and decisions regarding the legal issues are not based upon delusional material. At this time, Mr. Ecker does not have any idiosyncratic or delusional beliefs about his attorney and appears to have the ability to engage in a forthright and candid relationship with his attorney. At this time, it appears Mr. Ecker has the capacity to follow the proceedings in the courtroom and to assist his attorney during the trial. He also appears to be capable of rationally waiving his right to trial and other constitutional protections. It is also our opinion Mr. Ecker has the capacity to testify adequately in his own behalf if it is decided he should do so without the intrusion of delusional material. In summary, it is the opinion of the Forensic Team Mr. Ecker is able to understand the nature and consequences of the proceedings against him and to assist properly in his defense. His competency, however, is dependent upon his continued treatment with medication, if the medication is discontinued or he becomes noncompliant with the medication,

he will become psychotic in a relatively short period of time which will render him incompetent to stand trial.

Mr. Ecker is ready to proceed with the processing of his legal charges. Mr. Ecker is considered psychiatrically stable and is not felt to be an imminent risk for harm to himself or others. There are no specific medical needs which require special follow-up. There are no special precautions needed for travel. Mr. Ecker requires follow-up with both psychological and psychiatric services to monitor both his medication and psychological status. Mr. Ecker is currently on a combination of: Risperdal, Consta 25 mg every two weeks, valproic acid 500mg twice daily, propranolol 20mg three times daily, and trihexyphenidyl 2mg three times daily.

_____  
Robert G. Lucking, M.D.  
Staff Psychiatrist  
Mental Health Department  
Federal Medical Center  
Butner, North Carolina  

_____  
Angela Walden-Weaver, Ph.D.  
Staff Psychologist  

RGL/aww/sjt/je