UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JOHN LEONARD ECKER          )
              Petitioner          )
                      )
        v.                    )          Civil Action No. 00-40070-GAO
                      )
MICHAEL L. BENOV            )
            Respondent          )

## DECLARATION OF GARY RIGGS, M.D.

I, Gary Riggs, do hereby declare and state the following:

1.      I am employed by the Federal Bureau of Prisons as a Psychiatrist at the Federal Medical Center (FMC) in Devens, Massachusetts. I have held this position since August 1999, and have been employed as a Bureau of Prisons Psychiatrist since September 1993.

2.      I received my M.D. degree in 1976 at the University of North Carolina School of Medicine. I completed my psychiatry residency at Eisenhower Army Medical Center in Fort Gordon, Georgia, in 1981. I served in the United States Army for nine years as a psychiatrist, including six years after my residency. Additionally, I worked as a civilian psychiatrist for six years after serving in the Army.

3.      As a Bureau of Prisons Psychiatrist, I am responsible for providing psychiatric treatment to and management of mentally ill inmates, including inmates committed to the custody of the Attorney General pursuant to 18 U.S.C. § 4246 (hospitalization of a person due for release but suffering from mental disease or defect). In order to perform my official duties, I have access to Bureau of Prisons records and databases pertaining to federal prisoners including, but not limited to, inmate medical files, inmate Central Files, and the Bureau's "Sentry" computer database.

4.      John Leonard Ecker, Reg. No. 90050-038, was transferred to FMC Devens from the United States Medical Center for Federal Prisoners (USMCFP) in Springfield, Missouri, on July 13, 1999. I have been Mr. Ecker's primary psychiatrist since September 1999. Prior to executing this declaration, I thoroughly reviewed his relevant Bureau of Prisons records.

5.      In November 1989, Mr. Ecker was indicted in the District of Massachusetts for possession of a firearm by a felon in violation of 18 U.S.C. § 922(g). After federal authorities found that his mental illness rendered him incompetent to stand trial and dangerous to the public, he was committed to the custody of the Attorney General pursuant to 18 U.S.C. § 4246 on October 16, 1993.

1

018

by United States District Court Judge Paul A. Magnuson in the District of Minnesota.

6.     Mr. Ecker has a lengthy history of violence and criminal activity, including prior convictions for arson, burglary, breaking and entering, and assault with a weapon. He also has a lengthy history of mental illness, including diagnoses of Schizophrenia with delusions of an erotomanic nature and Antisocial Personality Disorder. Further information regarding Mr. Ecker's psychiatric history and history of violence is contained in his most "Risk Assessment Panel Report," dated July 31, 2000, a true and accurate copy of which is attached to this Declaration.

7.     As a result of Mr. Ecker's noncompliance with his antipsychotic medication over the past three months, he exhibited signs that are consistent with a diagnosis of Schizophrenia, Paranoid Type.   These signs include paranoia, loose associations, preoccupation with internal stimuli (manifested by conversations with himself in his cell), bizarre thoughts (such as asking for ether so he could perform surgery on himself), ambivalence, and flat affect. As a result, on August 16, 2000, an involuntary medication hearing was conducted pursuant to 28 C.F.R. §§ 549.43 et seq.   The Hearing Examiner determined that Mr. Ecker is mentally ill and potentially dangerous to himself or others, that medication was necessary to treat his mental illness, and that he was gravely disabled.

8.     Mr. Ecker can appear to be very logical and reasonable at times, which could lead anyone to doubt his diagnosis of Schizophrenia.   My interaction with Mr. Ecker over the past three months, however, has removed any doubt from my mind.   It is my professional opinion that Mr. Ecker is a very well-defended Paranoid Schizophrenic; i.e., he has the ability for brief periods of time to present himself without any obvious psychotic symptoms due to his innate coping skills and ability to recognize when he might be about to say or do something which would be incriminating.  Ordinarily, this ability to monitor himself would be seen as positive.  However, given his underlying character disorder (according to psychological testing) as a manipulative psychopath, this ability to mask psychotic symptoms, in my opinion, makes him dangerous.  This is especially true given that a good deal of his psychopathology has to do with erotomanic traits which have led to a documented history of obsession with female Bureau of Prisons staff members.

9.     In my opinion, should Mr. Ecker be released from custody, he would discontinue all medication and, as I recently observed, would deteriorate into flagrant Paranoid Schizophrenia and would definitely present a danger to others.  As reflected in Mr. Ecker's "Risk Assessment Panel Report" dated July 31, 2000, my FMC Devens psychiatry and psychology colleagues agree with this assessment.  Specifically, the Risk Assessment Panel unanimously agreed that Mr. Ecker suffers from a serious mental illness and has very little insight into the "manifestations of noncompliance and deviance from his treatment plan." The Panel also agreed that Mr. Ecker would pose a "serious risk to the well being of others should he be released from a secure setting."

10.    Despite repeated efforts to place Mr. Ecker in his state of domicile (Massachusetts), state authorities have not been willing to assume responsibility for his custody, care, and treatment.  Most recently, on February 15, 2000, the Massachusetts Interstate Compact Coordinator (ICC) informed FMC Devens staff that the state "will not be able to accept John Ecker under the terms of the

019

Interstate Compact for Mental Health. as there is no appropriate program available to meet his needs." A true and accurate copy of the ICC's February 15. 2000. letter is attached to this Declaration.

I declare under penalty of perjury that the foregoing is true and accurate to the best of my knowledge.

EXECUTED this _13th_ day of September. 2000

Gary Riggs, M.D
Psychiatrist
FMC Devens. Massachusetts

3



U.S. Department of Justice
Federal Medical Center Devens
*Box 580*
*Ayer, MA 01432*

## RISK ASSESSMENT PANEL REPORT

Ecker, John
Reg. No. 90050-038
July 31, 2000

## INTRODUCTION:

Mr. Ecker is a 40-year-old single Caucasian male, who was transferred to Federal Medical Center Devens from the United States Medical Center for Prisoners in Springfield, Missouri on July 13, 1999. He was evaluated at Federal Medical Center Rochester, after being arrested on charges of "A Felon in possession of a firearm," in November 1989. Subsequently, the court ruled that Mr. Ecker suffers from a mental disease or defect, and that his unconditional release would create a substantial risk of bodily injury toward another person or serious damage to the property of another. As a result, he was committed under the provisions Title 18 U.S.C., Section 4246 on April 16, 1993. He has been treated and housed at Federal Correctional Institution Butner, FMC Rochester, USMCFP Springfield, and FMC Devens.

## PSYCHIATRIC HISTORY:

Mr. Ecker has a history of chronic mental illness, characterized by delusions that involve conspiracies by the CIA and BOP staff members. He also has exhibited erotomanic delusions that involve romantic and erotic fixations on female staff members in the BOP facilities in which he has been housed. These erotomanic delusions have led to inappropriate and disruptive behaviors by Mr. Ecker toward female staff members, and on one occasion resulted in Mr. Ecker writing a threatening communication to a female staff member who was the object of a delusion. He carries a diagnosis of Schizophrenia, paranoid type; a disorder from which he has suffered since age 14.

From his arrival to FMC Devens on July 13, 1999 until his Risk Assessment on October 12, 1999, Mr. Ecker was housed in the Mental Health Unit and was compliant with his medication. However, he received two incident reports; one for possessing an unauthorized item, and one for lying or falsifying a statement. During his Risk Assessment, it was noted that though his medication had

---

*Sensitive Limited Official Use Only*

been somewhat beneficial in reducing the severity of his psychotic symptoms, he still was felt to pose a substantial risk of harm to others or to the property of others if released into the community.

## HOSPITAL COURSE AND TREATMENT:

Mr. Ecker did not agree with the opinion of the Risk Assessment Panel in October 1999, and questioned this very closely. He did continue to take his medication, but in spite of his medication has experienced problems which have led to subsequent hospitalizations on the locked Inpatient Unit (N3). His first readmission, October 1, 1999 through November 8, 1999, was prompted by problems adjusting to working in the Carpenter Shop and by his preoccupation and obsession with being allowed to have a razor on his housing unit. He badgered numerous staff and would not take stated policy for an answer. Because of his deterioration and his complaints of side effects from medications, specifically side effects from Haldol, we discussed and agreed upon a different treatment regimen. He did respond to his new treatment regimen with lessening of anxiety, decreased obsessions, and a decrease in his paranoia. He was then allowed to go back to his former housing unit in the Mental Health Unit, after the Treatment Team agreed that he had been cooperative and that his obsessiveness was less.

His next readmission, March 21, 2000, was prompted by his placement in the N1 Unit following an incident in which he had found what turned out to be a vitamin tablet allegedly placed in his food in mainline. He was very paranoid about this situation. He was very paranoid and angry at the inmate who he thought had placed this pill in his food. Because of this, he was reported to have contacted a Food Service inmate and asked that inmate to provide a knife for him, so that he apparently could settle the score with the inmate who he felt had attempted to do something to him with the pill. During this hospitalization, Mr. Ecker was very paranoid, angry, easily agitated, and frustrated about the entire situation. Because of the nature of the incident involving his apparently attempting to secure a weapon with which to do bodily harm, a decision was made by corrections to restrict Mr. Ecker to N3 for his safety and the safety of others.

On N3, Mr. Ecker was initially quiet and cooperative, and went about doing his legal research. By and by he began to question about the need for medication and the reasons for him being on N3.

Mr. Ecker was taken down to the N1 Unit once again, for allegedly shadowing a female employee (a nurse). He was on N1 for investigation concerning this incident. After the investigation, he was allowed to return back to the N3 Unit, since arrangements had been made for the staff member and Mr. Ecker to not be on the same unit at the same time.

Mysteriously, Mr. Ecker's Outpatient Chart disappeared. On July 7, 2000, Mr. Ecker was reported to have taken the contents of his Inpatient Chart from the N3 Nurse's Station. Because of this, he was once again place on N1 for investigation. By this time he had been refusing to take his antipsychotic medication, Quetiapine for approximately four weeks. He was noted to be more paranoid and more agitated, as well as, more intense and prying in his interactions with all staff. Though he denied taking his medical records, he did state to Dr. Riggs that it is his intention to be

*Sensitive Limited Official Use Only*

released from the Bureau of Prisons on the grounds that documentation of his treatment is incomplete. He further stated to Dr. Riggs, very forcefully, that he will get out of here by whatever means necessary. He continued to refuse to take his antipsychotic medication in spite of encouragement from his treating psychiatrist and other staff members, until he was told a Due Process Hearing will be held.

He does not believe he has a mental illness which requires antipsychotic medication, and believes he is being treated unfairly. The Due Process Hearing was explained to him as a means to have an objective third party make a decision about whether or not he needs medication. After learning about the Due Process Hearing, he did indicate in a cop-out that he would take his medication since he had been "threatened" with involuntary medication. On the very first administration of his Quetiapine, after stating he would once again take his medication, he cheeked his medication (which was observed by the nurse who dispensed the Quetiapine).

At the present time, Mr. Ecker is very anxious, he is paranoid, and he is questioning any staff member who will come to his door. These questions pertain to why he cannot go to the N3 Unit, why he has to take medication, and what they think of how he is doing mentally. In other words, he appears to be desperately seeking the "right" answers to his questions. He has no insight at all into his illness, the behavior which has resulted in his present situation on N1, nor in the need for treatment. Even thought he was directly observed cheeking his medication, he still denies that he did this. He has also become more grandiose in his ideas about how his court case is going to turn out. He has stated to staff members that he is certain that the court will rule in his favor and will release him because he is being held on no grounds.

## HISTORY OF VIOLENCE:

Mr. Ecker has displayed poor institutional adjustment. Mr. Ecker has received a number of Incident Reports for Threatening Bodily Harm, Bribing Staff Members and a number of greatest severity prohibited acts (100 series) including Code 101, Assault with Serious Injury. Mr. Ecker has not been charged with any high category prohibited acts (200 series) Incident Reports since July 5, 1998. However, Mr. Ecker has received a number of Incident Reports since July 5, 1998 that reflect a manipulative behavior. Most recently Mr. Ecker received an Incident Report for disruptive conduct. Mr. Ecker has continued to be a management problem since his arrival at FMC Devens. This is exhibited by his inability to remain on an open range and his regular placement on the seclusion range of the Mental Health Unit. Mr. Ecker also has a history of stalking staff and interacting inappropriately with members of the staff. Mr. Ecker asks inappropriate questions of a personal nature. Mr. Ecker has continually been warned of his actions, but does little to correct them.

According to the 1997 Risk Assessment Report, in 1974, Mr. Ecker made a wick for a firebomb to be placed into the gas tank of his neighbor's car. In 1982, Mr. Ecker was sentenced to 10 years for Assault and Battery. He was paroled in 1984. Mr. Ecker was also convicted of Arson in Baltimore, Maryland.

*Sensitive Limited Official Use Only*

## PSYCHIATRIC DIAGNOSIS:

AXIS I:       295.30 Schizophrenia, Chronic, Paranoid Type

AXIS II:      301.7 Antisocial Personality Disorder

AXIS III:     Anal Fissure (by history), GERD, and Asthma (by history)

AXIS IV:      serious mental illness

AXIS V:       GAF = 30, BOP = I

Present medications: Quetiapine 150mg p.o.- h.s., Paxil 20mg p.o.-h.s., Remeron 15mg p.o.-h.s., Prevacid 30 mg p.o. at night, Vitamin E 400IU bid, Mylanta Suspension 30cc p.o.-prn, and Metamucil pkt. in water prn.

## COMMUNITY RESOURCES:

No new resources were identified.

## INTERVIEW IMPRESSIONS:

The patient felt there was no need to come to the Risk Assessment because he is sure it will be overturned anyway.

## OPINIONS AND RECOMMENDATIONS:

The unanimous opinion of the Risk Assessment Panel is that Mr. Ecker suffers from a serious mental illness of which he has very little insight into the manifestations of noncompliance and deviance from his treatment plan. Mr. Ecker has a pattern of behavior that is unremitting but is capable of being treated with antipsychotic medication to the extent that the attenuation of the more severe elements by virtue of reduced frequency, limited morbidity, and lessened intensity. The Panel agrees that it would pose a serious risk to the well being of others should he be released from a secure setting. The treatment team representative, Dr. Riggs, who is his treating psychiatrist, is referring Mr. Ecker to the Administrative Hearing Examiner to convene a hearing for the due processes involved in the application for the use of involuntary medication.

*Sensitive Limited Official Use Only*

REPORT PREPARED BY:

Dr. Paul Anderson
Staff Psychologist

James Fletcher, MD
Clinical Director

Dr. Jeff Sonnega
Staff Psychologist

Gary Riggs, MD
Staff Psychiatrist

kam

*Sensitive Limited Official Use Only*